## UNITED STATES DISTRICT COURT

### DISTRICT OF MAINE

UNITED STATES OF AMERICA )
                        )
       **vs.** )    Mag. No.   04. 63
                        )
**RAMON PEREZ** )
     **A.K.A. MARTIN** )    21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)
                        )    and 846

### CRIMINAL COMPLAINT

I, the undersigned Complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

Commencing around December 2001 and continuing to June 2, 2004, in the District of Maine and elsewhere, the Defendant,

### RAMON PEREZ, A.K.A. MARTIN LNU

knowingly, willfully, and intentionally conspired with others known to commit an offense against the United States, that is, to unlawfully, knowingly, and intentionally distribute and possess with intent to distribute 5 or more kilograms of cocaine, a controlled substances listed in Title 21, United States Code, Section 812.

All in violation of Sections 841(a)(1), 841(b)(1)(A), and 846.

I further state that I am an agent of the United States Drug Enforcement Administration currently assigned to the High Intensity Drug Trafficking Area (HIDTA) Task Force in Portland, Maine, and that this complaint is based on those facts which are set forth in my affidavit of June 3, 2004, which is attached hereto and incorporated herein by reference.

Paul A. Wolf
Special Agent, DEA

Sworn to before me and subscribed in my presence this 3rd day of June 2004.

David M. Cohen
United States Magistrate Judge

A TRUE COPY
ATTEST: William S. Brownell, Clerk

By_____
          Deputy Clerk

## AFFIDAVIT

I, Paul A. Wolf, having been duly sworn, hereby state the following facts under oath.

1.    I am a Special Agent of the United States Drug Enforcement Administration (DEA), United States Department of Justice, posted to the DEA Resident Office in Portland, Maine. I have been a DEA Special Agent for approximately nine years. During that time, I have participated in numerous investigations into the unlawful distribution of illegal drugs, in violation of Title 21 of the United States Code. I have conducted or participated in surveillance, undercover transactions, the execution of search and arrest warrants, debriefings of informants, reviews of taped conversations, and analyses of drug, business, and governmental records. I am currently assigned to the High Intensity Drug Trafficking Area (HIDTA) Task Force in Portland.

2.    For approximately three months, I have been involved in a joint state and federal investigation into violations of federal drug laws by a group operating primarily in the area of Lewiston, Maine. During the course of the investigation, I personally participated in the events described in the following sections of this affidavit, or the law enforcement agents and civilian witnesses identified therein related the information to me.

3.    I have been advised by HIDTA Task Force Agent Gregory Boucher that on March 16, 2004, he and another HIDTA agent conducted a post-Miranda interview of Gerald Morrisette after approximately 90 grams of crack were seized from Morrisette's residence in Lewiston under authority of a state search warrant. Agent Boucher has advised me that Morrisette told them the following during the interview:

a.    From 2002 until early 2004, Morrisette periodically drove Donald Couture's white work van to Lawrence, Massachusetts to pick up, on behalf of Couture, ½-1 kilogram of cocaine powder from a source of supply known to Morrisette only as Martin. During

the past year, Morrisette made 4-5 such trips, carrying $15,000-$30,000 per trip provided by Couture to buy the drugs.

      b.     On several occasions after returning from these trips and delivering the drugs to Couture, Morrisette observed Couture process the cocaine powder into crack by cooking it on his kitchen stove at the 139 Howe Street residence.

    4.     In April 2004, I was informed of the following facts provided by David Norman during a proffer conducted at the U.S. Attorney's Office in Portland, Maine [Note: I know from my involvement in this investigation that Norman has been charged with violations of state drug laws and that, in part, he is hoping for prosecutorial consideration in resolving that case in return for his cooperation in this investigation]:

      a.     In late 2001, Norman met Donald Couture, a.k.a. Dipper, of 139 Howe Street in Lewiston. Within a short time of this meeting, Couture and Norman began traveling on a regular basis from Maine to Lawrence, Massachusetts to buy large quantities of cocaine powder from an individual known to Norman only as Martin. Eventually, Norman became Couture's regular driver.

      b.     When these trips began around December 2001, Couture was picking up 6-8 ounces of cocaine powder per trip from Martin. These amounts increased to 1/4-1/2 kilograms of cocaine powder per trip by February 2002. By March 2002, Couture and Norman were traveling to Lawrence 3-4 times per month and picking up a kilogram of cocaine powder from Martin on each trip. In order to pay for the drugs, Couture would carry a duffel bag containing $25,000-$30,000 in cash.

      c.     After transporting the cocaine powder back to Maine, Couture, with the

2

assistance of others including Norman, broke down and packaged the kilograms into 1/4, ½, and 1

ounce portions for distribution to number of regular customers. On one occasion, which took

place sometime during the past few months, Norman witnessed Couture distribute in a single

transaction 3-5 kilograms of cocaine powder Couture and Norman had obtained from Martin.

5.    On May 24, 2004, other law enforcement agents and I arrested Donald Couture in

Lewiston, Maine for conspiracy to possess with intent to distribute and distribute cocaine powder.

Within a short time, Couture made a post-Miranda statement to me and other agents at the scene

of the arrest, telling us, in substance, that: (a) his source of supply for cocaine in Lawrence,

Massachusetts was an individual named Martin; and (b) he normally procured a kilogram of

cocaine from Martin for $32,000, but at the present time he owed Martin a drug debt of $8,000 for

prior transactions.

6.    The following events occurred on June 2, 2004:

a.    At approximately noon, an individual who will be identified in this affidavit

as CS-1 placed a recorded telephone call under my direction and in my presence to Martin at a

Massachusetts area code telephone number.[1]  After the call, I played the recording in CS-1's

presence. He/she identified the other voice on the tape, which was that of a male with a Hispanic

---

[1]Both Couture and Norman provided me with Martin's contact telephone number
in Massachusetts. However, attempts to call this number in late May 2004 indicated that
it had been disconnected. I have been advised by Norman that he was present at
Couture's residence the day after Couture's arrest when Couture's girlfriend received a
telephone call she said was from Martin. According to Norman, during the call Martin
gave the girlfriend his new contact number, which she relayed to Norman and he has
relayed to me. On June 2, all of Norman's calls to Martin were to the latter number, and,
according to caller ID on Norman's cellular telephone, all of the calls from Martin to him
were from the same number.

3

accent, as Martin. In reviewing the tape I heard Martin agree to meet CS-1 at around 2 P.M. at a location in Lawrence. Martin also stated, in substance, that he was calling his source and would have cocaine powder available to deliver to CS-1 at the time of the meeting.

      b.     On the strength of this telephone conversation, other agents and I drove with CS-1 to Lawrence, Massachusetts and met with other law enforcement agents. At around 2 PM, I observed CS-1 place a recorded call to the same number he/she had called earlier to contact Martin. I have reviewed the tape of that conversation and overheard CS-1 and Martin agree, in substance, to meet in 10 minutes at the usual location. CS-1 described that location for me as the intersection of Saratoga Street and Lawrence Street, next to the Pizza Pub Restaurant. I then drove with CS-1 to that location and parked.

      c.     After we waited a short time for Martin to arrive, I directed CS-1 to place a call on his cellular telephone to Martin to determine his whereabouts. This call was not recorded, but I was in CS-1's presence when he/she placed the call and during the ensuing conversation. CS-1 informed me after the call that Martin had instructed him/her to wait in the Pizza Pub and to call him back in 15 minutes [Note: From monitoring CS-1's side of the conversation, it was clear to me that CS-1's representations of Martin's instructions were accurate].

      d.     At my direction, CS-1 went inside the restaurant. After approximately 20 minutes, CS-1 called me on his/her cellular telephone from inside the restaurant and said that he/she had spoken to Martin by telephone. According to CS-1, Martin told him/her that he had cocaine available but that it was of substandard quality. CS-1 also told me that Martin told him/her that he was attempting to find better-quality cocaine. A short time later, CS-1 rejoined me in my vehicle. After a series of unrecorded calls between CS-1 and Martin over the course of

4

approximately an hour, all of which CS-1 made in my presence inside my vehicle, Martin agreed to meet with us.

        e.      Within a minute or so, a Hispanic male who identified himself as Martin entered my vehicle and sat in the front passenger seat. In substance, the following conversation then took place [Note: During the conversation inside my vehicle, I recognized Martin's voice as similar to the one I overheard during the preceding recorded calls setting up the drug transaction]:

        (1)     Martin said that "nobody got nothing good," and that he had "cooked" the cocaine powder he had and it "came back" at only around 70 per cent purity. Martin added that it was possible that someone would have better cocaine powder in a few hours or perhaps the following day.

        (2)     I told Martin that I would not leave my money with him, and that I was upset after waiting for two hours for him to show up for the meeting. When I asked how much "Donnie" (Couture) owed him, Martin replied "8" (thousand dollars). We then spent several minutes negotiating whether I would leave Martin with a portion of the money for him to produce a "good one," and whether I would pay him part of the money Couture owed him. Martin was adamant that the cocaine powder, which he said came from Puerto Rico, would cost me 32 (thousand dollars).

        (3)     In an apparent attempt to induce me to leave him with a portion of the buy money, Martin told me that he "had worked with him (Couture) like two years now." Martin then placed a call on his cellular telephone and had a conversation with someone in Spanish.

        (4)     At this point, because of concerns relayed to me over my cellular

5

telephone by members of the surveillance team suggesting that the area in which I was parked was not secure, I told Martin that we "would pull up here a little bit and I'll get it" (a portion of the buy money). I then drove a short distance to a nearby location. As we were driving, I told Martin that I did not want to leave all of my money with him. He replied that it would be all right to leave only "15 or 20" (thousand dollars), and that he would call me that evening to let me know about the availability of the cocaine. After I parked and was exiting the vehicle, ostensibly to get the money, he told me to give him "20" (thousand dollars). Within a matter of seconds, other agents approached the vehicle and placed Martin under arrest.

7.    Following Martin's arrest, he told other agents and me that: (a) His true name is Ramon Perez; (b) his date of birth is December 4, 1967; (c) he is from the Dominican Republic; and (d) he is in the United States illegally.

Paul A. Wolf

Sworn to and subscribed before me this 3rd day of June 2004.

U.S. Magistrate Judge

6